[8 NYS3d 549]

THE PEOPLE OF THE STATE OF NEW YORK, Plaintiff, v BARRY McRAE, Defendant.

Criminal Court of the City of New York, Bronx County, March 11, 2015

**APPEARANCES OF COUNSEL**

*Robert T. Johnson, District Attorney* (*Ketaki Chakrabarti* of counsel), for plaintiff.

*Bronx Defenders* (*Ashley Burrell* of counsel) for defendant.

**OPINION OF THE COURT**

LINDA POUST LOPEZ, J.

Defendant Barry McRae is currently on trial for the charges of menacing in the third degree (Penal Law § 120.15) and harassment in the second degree (Penal Law § 240.26). The charges are a class B misdemeanor and a violation, respectively, and this is a bench trial. Defendant also has a parole violation pending, and that violation is based on the allegations charged herein.

The sole witness presented by the People was the complainant, Yahna Williams. The only other evidence in the trial was a recording of a 911 call. This exhibit was introduced through the complainant. The defense presented no case. By late morning of March 10, 2015 both sides had rested. Summations were to begin directly after the lunch break.

At the start of the afternoon session the court noticed the complainant in the audience and told the court officers that she should continue to wait outside. The complainant did step out, but the People objected, saying that Ms. Williams was very interested in attending the remainder of the proceedings, and arguing that she had a right to be there. The defense objected to the complainant's presence during summation. The People asked for time to prepare an argument on the issue. The court, noting that there was a calendar matter in the part that had to be dealt with that would take some time, suggested the People use that time period to call their Appeals Bureau and prepare an argument.

Rather than conduct research or prepare an argument, however, the People apparently spent the time pursuing other audiences. However, because this court makes rulings based upon the law, after considering only the legal arguments advanced to it by both parties, and all relevant case law and statutes that it may find in its own research, no decision was forthcoming at that time. The court thus adjourned the matter for the next morning, saying there would be a written decision then. Both sides were invited to email their legal arguments to the court tonight, and both sides have done so (and this court is impressed at the detailed research and cogent arguments produced in the matter of only a few hours). Having considered these arguments from both sides, this court decides as follows.

The right to a public trial is one of the foundations of a free society. Recognized as a vital right long before our Bill of

Rights, the right to a public trial has been entrenched in the common law for centuries. (*People v Colon*, 71 NY2d 410 [1988].) Perhaps it was the abuses of the Star Chamber which helped to emphasize the importance of an open and public proceeding. Indeed, just the mention of the name of the Chamber evokes a dark and frightening place, where great evils are carried out at the hands of the state. The Star Chamber, that medieval court of criminal jurisdiction which was used as an instrument of oppression by the Tudor kings, operated in secret, with no juries, and no spectators allowed. (*United States v Bolles*, 209 F 682 [WD Mo 1913].) Since the abolition of that body in 1641, the right to a public trial has been recognized by the common law (*Colon* at 413), and was enshrined in our Bill of Rights in the Sixth Amendment to the US Constitution, and applied to the states by way of the Fourteenth Amendment. (*Id.*)

What is interesting about the right to a public trial is that it is unique among the other important rights that come into play in a criminal trial in that it is at once the right of the accused, and the right of the society. The defendant's right, as we have noted, is enshrined in the Sixth Amendment to the US Constitution, which states in relevant part, "In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial." The Sixth Amendment recognizes no right of the public to attend trials, however. It provides for the right of the accused only. (*Gannett Co. v DePasquale*, 443 US 368, 379-380 [1979].)[1]

The public does have a right to attend criminal trials, though, by virtue of the First Amendment. (*Richmond Newspapers, Inc. v Virginia*, 448 US 555 [1980].) "The right to attend criminal trials is implicit in the guarantees of the First Amendment; without the freedom to attend such trials, which people have exercised for centuries, important aspects of freedom of speech and 'of the press could be eviscerated.' " (*Id.* at 580, quoting *Branzburg v Hayes*, 408 US 665, 681 [1972].)

While there is a constitutional right to attend criminal trials granted to the public, that right is not necessarily imbued in any one person. The People here have referred to the "complainant's right" to attend the trial here. The defense has questioned the People's standing to represent the complainant in such a

---

1. Unlike many other states, New York's Constitution includes no right to a public trial. That right, in New York, is statutory. (Civil Rights Law § 12; Judiciary Law § 4.)

claim. This court agrees that the People cannot properly argue for any "right" of the complainant, if such a right exists to her individually. The complainant here is but a witness; she is not a party to the proceedings and the People do not represent her. She has no special right by virtue of being a complainant.[2]

So while it is inappropriate for the People to argue on behalf of any "right" of the complainant, the People are able to argue in favor of the societal, First Amendment right to an open courtroom, as would the defense be able to so argue. If the parties to this proceeding cannot argue in favor of this societal right, who could? While large media organizations at times ask to intervene when these issues arise, and argue in favor of open courtrooms, it is not reasonable to deputize the media as the only enforcers of the public's right. The vast majority of criminal trials begin and end without ever becoming of interest to the media. That should not be the deciding factor on whether there is anyone to argue in favor of the public's right to an open trial.

Although the defendant has a Sixth Amendment right to a public trial, and the public has a First Amendment right to have trials public, neither right is absolute. Countervailing concerns and conflicting rights at times require a modification of the worthy presumption that all proceedings be completely open. For example, where the People can satisfactorily establish that the safety of an undercover officer is likely to be put in jeopardy by his or her testifying in open court, the courtroom may be closed for that officer's testimony. (*People v Hinton*, 31 NY2d 71 [1972].) Where a showing has been made that certain spectators have tried to intimidate a witness during his testimony, those spectators may be excluded during that witness's testimony. (*People v Hagan*, 24 NY2d 395 [1969].)

---

2. Many states have in recent years amended their constitutions to include "Victims' Rights Acts." Colorado, for example, has adopted a thorough Victims' Rights Act, which gives a "victim" the right to be heard, and be present, at all material stages of the proceeding, including the setting of bail. (Colo Const, art II, § [16a].) This amendment to the Colorado constitution provides that a "victim" has the right to be present during at a trial, and that right has been recognized to outweigh other considerations associated with the criminal trial, including any witness sequestration. (*Id.*; *People v Coney*, 98 P3d 930 [Colo Ct App 2004].) New York, however, has not adopted any comparable Victims' Rights Act. Indeed, even the use of the term "victim" is not in common usage here in New York, and it may be argued the complainant is not a "victim" until that has been proven by the People beyond a reasonable doubt.

A common exception to the right of the public to attend a trial is the witness sequestration rule. Under that rule, a trial judge may, in her discretion, bar witnesses or potential witnesses from the courtroom during other witnesses' testimony. This ancient, time-honored practice, the purpose of which is to facilitate truthful testimony and discourage collaboration among witnesses, has roots that go back to biblical times. Any scholarly discussion of the rule begins with the story of the wise judge Daniel, who was called upon to deal with the accusation that the wife of a nobleman had committed fornication under a tree in a garden. Poor Susanna was accused by two witnesses, and things were not going in her favor, until Daniel came up with an effective method of determining whether the two were being truthful, or were out to get Susanna for declining their advances, as she alleged. Daniel said:

> "Are you such fools, you sons of Israel? Have you condemned a daughter of Israel without examination and without learning the facts?". . . And Daniel said to them, 'Separate them far from each other, and I will examine them.'
>
> "And when they were separated from each other he summoned one of them and said, . . . 'Now then, if you really saw her tell me this: Under what tree did you see them being intimate with each other?' He answered, 'Under a mastic tree. . . .'
>
> "Then he put him aside and commanded them to bring the other, and he said to him, . . . 'Now then, tell me under what tree did you catch them being intimate with each other?' He answered, 'Under an evergreen oak. . . .'
>
> "Then all the assembly shouted loudly and blessed God. . . . And they rose against the two elders, for out of their own mouths Daniel convicted them of bearing false witness. . . .
>
> "And from that day onward Daniel had a great reputation among the people." (Book of Susanna [verses 48-64], Apocrypha of the Old Testament, Revised Standard Version, as quoted in Ralph Slovenko, *Sequestration of Lay Witnesses and Experts*, 32 J Am Acad Psychiatry & L 447, 447 [2004] [some versions of the story have one of the trees an Ohm tree].)

Keeping witnesses out of the courtroom, even if they are only potential witnesses, has universally been held to be such an

aid to the promotion of the truth and a protection against collaboration that it does not violate the public's right to an open trial. (*See e.g. United States ex rel. Corby v Conboy*, 337 F Supp 517 [SD NY 1971].) Nor does it violate the defendant's Sixth Amendment right to a public trial. Indeed, in one case from another jurisdiction, the court's order that all witnesses be excluded from the courtroom included defendant's wife, who was expected to testify. Defendant and his wife so much wanted the wife to be present for the trial that she opted to forgo testifying in order to be there to watch the proceedings. The appellate court held that the trial judge's order was proper, even despite the defendant's claims that it forced him to choose not to put on a defense. (*People v Jenkins*, 10 Ill App 3d 588, 295 NE2d 123 [1st Dist, 2d Div 1973].)

However, where the testimony has been completed and the parties are ready to begin summations, excluding those who have already testified does violate the defendant's Sixth Amendment right to a public trial. (*People v Spence*, 239 AD2d 218 [1st Dept 1997] [defendant's wife testified at trial, and both she and defendant wished her to be in the courtroom for summations, but the trial judge excluded her].) But what if it is the defendant who asks for the witness to be barred? What if, as in this case, the defendant is concerned that if the complainant is present for summations she will be able to tailor her testimony later to cure any inconsistencies pointed out in summation, either at any eventual retrial, or at defendant's parole hearing?

This court has considered the argument that, upon hearing defense counsel critique her testimony and question her credibility (which one can only assume defense counsel will do in a one-witness case where identification is not an issue), the complainant will be better able to tailor her testimony at any later proceeding. Defendant is most concerned about his parole hearing, and rightly so. It is at that proceeding that he faces the most jail time. And, even if he is acquitted here, he can be convicted at the parole hearing, with its lower standard of proof. So defendant's concern that complainant's ability to modify her testimony in any way be reduced as much as possible is understandable.[3]

However, as the People point out, when this trial is over the complainant would be able to review the transcripts of her

---

**3.** This court does not imply that complainant would intentionally change her testimony, or that she would not. Even the possibility of an unconscious

testimony and of the summations. And she would likely be expected to review her testimony, and any of its inconsistencies, with the Assistant District Attorney or with the prosecuting parole officer. These opportunities are not available to a witness when the initial proceeding has not yet concluded. So any effect to the truthful spontaneity of complainant's subsequent testimony would not be much different if she sat in the courtroom during summations, as if she merely reviewed the transcript. And if there were to be any difference at all, it would be so miniscule that it would not justify abrogating the public's right to an open trial.

The complainant is therefore permitted to sit in the courtroom, now that the testimony has concluded, should she so desire.

---

modification after hearing the summation is an understandable concern of defendant's, however.